JACK JOBE, ALIAS GRUNDY JOBE, V. THE STATE.

No. 2815.   Decided December 3, 1913.

1.—Burglary—Accomplice—Corroboration.

Where, upon trial of burglary, the testimony showed that some of the witnesses were accomplices, their testimony required corroboration, and is not sufficient otherwise to sustain the conviction.

2.—Same—Practice—Practice on Appeal.

In the absence of bills of exception, objections to the remarks of prosecuting officers, overruling the motion for continuance, and the admission and rejection of testimony, can not be considered on appeal.

3.—Same—Insufficiency of the Evidence.

Where, upon trial of burglary, the evidence was insufficient to sustain a conviction, the judgment must be reversed and the cause remanded.

Appeal from the District Court of Tarrant.   Tried below before the Hon. R. H. Buck.

Appeal from a conviction of burglary; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of burglary, his punishment being assessed at two years confinement in the penitentiary.

The alleged owner of the house and property was Joe Patterson. Patterson was the owner of a saloon located on East Ninth Street in Fort Worth, and had been in that business for eight years, and was so engaged in it on the night of the 15th of May when this matter is alleged to have occurred. When he left his house at night it was in good condition and properly closed. Some of the openings were glass windows. He says that there were no breaks about the building; when he left it in the afternoon everything was all right and no breakage about it. The next morning when he came down somewhere between ten and eleven o'clock it had been broken; all the windows had been broken and a door forced open; the mirrors in the saloon were all broken. "The front of the saloon was all torn up; the doors and windows were all knocked out, or rather the windows were and the doors broken in and seemed like the locks had been knocked open with a heavy instrument of some kind, crowbar or something. There was glass and empty bottles on the floor and furniture and everything else all torn up. The furniture inside the building was torn up in there, everything broke, whisky cases, bar fixtures and everything in there; some of the bar seemed to have been turned over, that is the back bar, and it was all down there, the work-board and everything was torn up and torn to pieces. I missed about two thousand dollars worth of

whisky, two or three hundred dollars worth of cigars, and wine and all such as that. I found a few bottles there and boxes. I left about two or three thousand cigars and two barrels of whisky and that had never been bunged; I left between eighty and a hundred cases of whisky; I left champagne and did not find any of that. The stuff that I had left there the night before was all gone next morning; there might have been two or three boxes there." Speaking particularly of the goods he had on hand he uses this language: "I had on hand Epworth whisky; that was in bottles; then I had some Maxwell whisky in bottles; then I handled Jersey Creme, that is in bottles; then I handled Myrtle Springs; that it is in bottles; then I had my barrel goods, Jersey Creme and Kentucky Home and all such stuff in barrels; that is the way I left my stuff. Then I had the John W. Brooks whisky in bottles. I think McGar handled that whisky too. McGar's place was sixty or seventy-five feet, I guess, from my place, just across the street." We might say here that McGar's place was also wrecked. This witness knew nothing about who broke into his saloon of his own personal knowledge, and says, "I can not swear that this defendant had anything to do with that or not. I don't claim that I know all the brands of whisky that are handled by the saloon men in Fort Worth; as a matter of fact they all handle different brands. I purchase from all these different wholesale houses here, some of the stuff. The furniture and stuff in there was all torn up. They broke my mirrors, all of them. They broke the big mirror back against the wall; that was broken all to pieces." He did not see many broken bottles; but it seemed like they were all packed off and carried off. The front is glass; the doors are double doors. The glass front was all broke to pieces. The building is a two-story building; there are rooms over the saloon, being a rooming house. He says there is a private club in there and rooms; some windows in the upper part of the house were broken.

Vann Childress testified he was working on the night of this transaction at Joe Vickery's barber shop. That Jobe worked there on the second chair. He says: "I don't know just the date but I seen him next morning after that raid; I saw him about ten minutes to six next morning; he came into the shop there; he had four quarts of whisky and a quart of wine; he sold me one bottle; I gave him fifty cents for it; I bought a quart of Jersey Creme. I seen several bottles, one broken one, as I came from breakfast. He asked me where I went the night of the raid and I told him I went home and he says good reason you did go home; I says, yes, I thought it was; I let my conscience be my guide. He had a pocketful of cigars; he asked me was I going to stay there and I says yes; I asked him was he going to stay there and he says yes, and I says, I am going to breakfast and after I came back there from breakfast he opened a quart of wine him and his brother had been drinking. He said he had been out in that raid the night before. He never said nothing particularly to me that morning, just different men coming in that

they were working on and talking together and talking about the raid that night but I never paid any attention to that at all. That was the next morning after the raid. . . . I went home that night of that raid. I went home because there was a gang around up here and I did not want to get into anything and I knew about what they were going to do so I went home. I just had a suspicion what they were going to do, that they were going to do something, and I went home. I don't know exactly where Jack got this whisky; he said he was going out in the raid. This conversation took place over at the shop where we were both working. I never saw anybody else but Blubber at the time he gave me the wine; Blubber was in there. There was nobody present in the shop that morning when I had that conversation except me and him." Speaking of the conversation he had with one of the attorneys, Mr. Baldwin, he says: "I told him I had been out early that morning and he came in there. I did not describe the kind of whisky he had. I don't know that I am sore about them tearing up all these darkies' property; I can't pay no mind to what some other nigger done; it is none of my business."

The witness Merrett says he saw defendant about one o'clock that night, and had a conversation with him. "Henry Vaughn and myself had been there to the jail, or here on the steps watching the crowd at the jail and we went home and stopped in over there to eat a lunch; we both room at the Scott hotel, and Grundy had some whisky; he had four quarts of whisky as I remember; that is what I seen. I remember one brand was Mitchell Spring or Myrtle Spring and the other Jersey Creme; I don't remember the other brands. The bottles were sealed. He had some cigars in his pocket; there was about a dozen in the upper coat pocket and a can of cigars in his lower coat pocket. He didn't say where he got this stuff. He said he had been down here and had plenty of whisky and wanted to sell some. He tried to sell some to me; he said he would take $3.50 for four quarts. I don't remember that he mentioned what part of town he had been in. I don't remember what he said about the raid. . . . There was nothing else said there by the defendant with reference to where he had been the night before or what he had been doing. I stated we had been over there at the court house steps watching the crowd at the jail and I just came from around there to this restaurant; there was quite a crowd around there. I was not in the crowd at the jail but I was over here and saw them going down Commerce Street; they were going in the direction of the negro raid; I understood that was on Ninth Street. When I saw them they were just starting out going like a bunch of hounds right down this street and then I was here as they came back; I was here on the steps in front of the court house when they came back. I would say it was 10:30 or 11 that I saw them go down there. I did not pay much attention to how many did go down but there was a big noise and I heard the noise that came from them. They were just yelling and talking. I was out here when they came up the street;

there was more than a hundred came up the street. That nigger killing that policeman is what I think caused all that excitement, and I taken that crowd to be the rioters that went down that way. I did not follow them to see what they were going to do."

The witness Schwain testified that he was night captain of the police force on the night of this raid. He says: "The saloons that were raided, as well as I remember, was Joe Patterson's place and McGar's; I don't remember of there being any others. I mean by raided that they just stampeded the saloon and stole a lot of stuff out of there. They threw stones, a shower of stones that broke out the windows and broke the furniture and mirrors. I understand they made some noise; I was not present myself. I went by indications when I said they had stampeded. I went down there early the next morning. It looked as though a cyclone had passed through there and the street was literally covered with brick, both small stones and big enough to carry in your pockets. They had been in Joe Patterson's place. McGar's place was also broken into. Then there was a bank there and drug store, jewelry shop; it all happened about the same time. It looked like they had come there to destroy property; it was a riot that resulted from this excitement here that day."

The witness Morris testified that he was fourteen years of age and had been working at the Savoy theater, and lived with his father and mother on Weatherford Street, his father being Dr. Morris. "I was down on Ninth Street the night there was some saloons broken into. I was on the opposite side of the street. I heard some windows crash in and bricks going through; I could not swear who throwed the bricks, and I saw people coming out and bringing whisky out. After this glass crashed I saw people going in there; I could not see them all, they were going in so fast; they were all men; when they came out they had whisky in their hands; some of them had whole boxes of cigars and cigarettes and Bull Durham. They were just getting whisky and coming out with it. They were all white men; some of them were young men and some of them were pretty old. I did not go up to the saloon where they were bringing it out. I don't believe I know this defendant. I knew some of the people who were bringing whisky out of there. I knew a few boys. I didn't stay there until they cleaned up that saloon. I just stayed about five minutes and left. I could not tell who it was broke it open; I was coming down this way when they broke the glass; I had just got off from work. They didn't go against the door; the bricks were flying; there was ten or twelve people throwing bricks and a big bunch around them. I guess there was a thousand people there, I did not count them. The bricks were flying through the air and they broke open the doors and windows; I saw some people going in there; just a big crowd of them went in there as soon as the doors were opened, they all went in there, and they commenced carrying it out; they were handing it out around to some of the boys

around there; some fellow would go in there and get some stuff and come out and pass it out around to the rest of them there."

The witness Musick testified he was around at the court house about 11:15 or 11:20 o'clock that night; that he saw the defendant there; saw him in the crowd in front of the jail; "he was talking but I could not call to mind the exact words he said there at the jail; I could not tell you how long he was there; I seen him in the crowd just like I seen several others there; I didn't notice any one particularly or when they left; this crowd remained there up to near 1 o'clock, maybe a little later than that and then it dispersed. The crowd was coming and going all the time; individuals would break out of the crowd and leave and then others would come in. I did not see a great number of them leave and go in any particular direction; I seen a bunch return. I did not see this man in any crowd that was down on East Ninth Street. I did not know at the time I was at the jail what had transpired down on Ninth Street. I went down to Joe Patterson's saloon and the doors were open and all glass was broken out, the inside of the saloon was nearly completely demolished, as nearly so as anything could be. There was no stock of goods in it; they were all gone."

The witness Flippin testified that he had a conversation with two men, one being defendant, the other man doing most of the talking; that during the conversation they informed him: "You want to be away from your beat up about the court house about nine o'clock, and he says we are going to take that nigger out—those niggers out and hang them or burn them, all three of them; says we are going to raise thunder, or something to that effect up here at that time. I told him I would not be on duty and had nothing to do with it; that I went off at or before nine o'clock and would not be there at that time at all. I rung off at 8:30."

Another witness says he saw defendant a couple of times the night of this transaction; the first time he supposes about 9 or 9:30 o'clock, and the second time about 11 or 12 o'clock or maybe after 12. The last time he had some cigars and whisky and some champagne; some Mumm's extra dry. He said he had been down on Ninth Street. He says, "I don't know where that whisky, wine and cigars came from. I don't know whether he went down there and stole them or whether somebody gave them to him; I did not see the saloon they came from; all I know is that he said he had got some from down on Ninth Street. That was the night after the raid; about an hour after the raid I suppose. I am not sure." This is the case practically in full on the facts.

From the evidence of the witness Childress he is an accomplice if appellant is guilty. He drank and got some of the whisky from defendant after the transaction, knowing beforehand, he says, the raid was going to occur and understanding that this whisky came "from the raid," as he terms it. His testimony to connect the defendant with the burglary would have to be corroborated, and this would apply to

any witness who received or bought any of the whisky from appellant, if the whisky came out of Patterson's saloon. This remark is made in a general way to show their testimony would not be sufficient unless corroborated.

There are some grounds of the motion for new trial that can not be considered in the absence of bills of exception: The remarks of the prosecuting officers, the application for continuance, and objections to some of the testimony. There are no bills of exception and these matters are in no way verified and pass out of consideration.

Appellant insists that the evidence is not sufficient. The writer is inclined to the opinion that this contention is correct. To sum up in a general way, this evidence shows that a policeman had been killed by a negro, and that a mob had gathered around the jail for the purpose of securing this negro as well as two others. In this they seemed to have failed, and then they passed from the jail down the street and tore up the saloons belonging to McGar and Patterson; wrecked them to such an extent that the captain of the night police said it looked like a cyclone had passed through that part of the town. No witness places appellant present at the wrecking of the saloons; no one identifies the whisky as coming out of Patterson's saloon, unless it be contended that the fact that appellant had a bottle of Jersey Creme and a bottle of champagne, Mumm's extra dry, and a bottle of Mitchell or Myrtle Spring whisky. Patterson had in his house champagne; he does not say it was Mumm's extra dry. He had also Jersey Creme and Myrtle Spring whisky in bottles, but he does not undertake to identify these as coming from his house. In fact, does not testify in regard to these one way or another. They may as well have come from McGar's. No witness places appellant at the scene of the wrecking of either saloon, and the connection, if it is made by the State, is found in the fact that he had four bottles of whisky and some cigars an hour or so after the wrecking of the saloons. If those saloons were wrecked for the purpose of stealing the goods out of them, then all parties who were present and engaging in it would be equally responsible as principals. If the saloon was broken, not for the purpose of stealing the whisky, but to wreck it because it belonged to the negroes Patterson and McGar in connection with the feeling of mob spirit with reference to failing to get the negroes in jail for killing the policeman, then the case might not be one of burglary for the purpose of committing theft. If the mob and riot spirit actuated the breaking of the saloons with no intent to appropriate the property, then it would not be a case of burglary. It is not burglary simply to tear a house to pieces; there must be the intent connected with it to commit some other offense in connection with the breaking and entry. But even if burglary was committed, and it be conceded the facts are sufficient to show a burglary, unless appellant participated in it, still he would not be guilty of burglary. He might be guilty of receiving stolen property if he knew that the property he had came out of the saloon. The most cogent fact against appellant

in connection with the burglary, it occurs to us, is found in the fact that he stated the whisky he had came out of the raid, or he got it in the raid, whichever it may be. · We have a line of decisions in effect holding that where a breaking has been shown and property taken in connection with the breaking from the broken house, and the property is identified as coming out of that house and found in possession of the accused, this would sustain a conviction for burglary. In order to sustain a conviction under this line of authorities it must show a burglary for the purpose of committing theft, and that the property was taken and recently thereafter found in possession of the accused, and this property must be identified as the property coming out of the house. Patterson did not undertake to identify this property, and no one undertakes to identify it as Patterson's property. The main fact by which it is sought to show this property is that of Patterson is that the whisky was Jersey Creme and Mitchell or Myrtle Spring whisky. There is no evidence in the record denying that this property came from McGar's saloon. The same mob that raided one raided the other; they were there in sixty or seventy-five feet of each other. McGar was not used as a witness, and no one connected with the McGar establishment was used as a witness. This record shows the testimony could have been made much clearer and stronger, identifying this whisky, and not only so, but it could have been shown whether or not appellant was in that crowd at either or both saloons. The record clearly shows that there was a great number of men in that mob, and they all seemed to have been white men. Out of that vast crowd who were out on the streets that night and in that riotous condition about the court house and around the saloons, evidence could have been obtained that would put this case in such a light that defendant's guilt could have been shown if as a matter of fact he participated in the taking of the property. There was a singular dearth of evidence in regard to that transaction, and it was one of the most important questions in the case, that is, to show that appellant was in the mob that broke into Patterson's house, and the purposes for which that breaking occurred. With the legal machinery under the control of the government and the courts this matter could have been elucidated clearly and satisfactorily. Appellant may have been in the crowd; they have not shown it. · He may have gotten the whisky from Patterson's saloon; they have not proved it when they could have done so. It is not shown that he did not receive it from others who were engaged in it, he himself not being present. In that crowd some one would have known or ought to have known the parties present. Every witness who testifies about the matter did not know whether appellant was in the crowd or not. None of them saw him there, and in fact there were many people on the street at that time of night and engaged in these matters and only one witness was placed on the stand, to wit: John Morris, who saw that crowd breaking in those saloons, and he did not see defendant there, and said they were

white men breaking in the saloon. The writer is not willing to agree to an affirmance of the case on this sort of record.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*